Bernard B. ANGELL, Jr.,
Plaintiff–Appellee,

v.

James A. LESLIE, Jr.; City of Hinton,
a municipal corp.,
Defendant–Appellant,

and

Harry Keaton, Defendant.

No. 87–1511.

United States Court of Appeals,
Fourth Circuit.

Argued July 7, 1987.

Decided Oct. 27, 1987.

---

818

John W. Feuchtenberger (Stone, McGhee, Feuchtenberger, Barringer & Czarnik, Bluefield, W.Va., on brief) for defendant-appellant.

James Byron Lees, Jr. (Hunt & Wilson, Charleston, W.Va., on brief) for plaintiff-appellee.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The plaintiff, who is a corporal in the police department of the City of Hinton (West Virginia) filed this 42 U.S.C. § 1983 action complaining of an alleged violation of his fifth amendment rights by reason of a disciplinary suspension of one day imposed for a refusal to comply with a known regulation of the police department. The defendants are the City, its Chief of Police, Harry Keaton, and its Mayor, James A. Leslie, Jr. After a trial by the Court, the district judge found that the plaintiff's infraction was excused as protected symbolic speech and imposed judgment for both compensatory damages ($10,000) and punitive damages ($20,000) against the defendants City and Leslie, the defendant Keaton having been dismissed before trial in a consent order.[1] From this judgment the defendants have appealed. We reverse.

I.

The City has long had a rule, that when a person is arrested for an offense punishable under both City ordinance and State statute, the officer making the arrest is to process the case in the city court system rather than the state system, and only if the municipal judge and mayor are unavailable for the arrested party's arraignment,

is such person to be taken for arraignment and trial before the State magistrate. This procedure was formalized in an official notice posted in the Police Department on March 13, 1985. The purpose of the rule is to assure that the City receives any fine imposed, if the party arrested should be convicted, rather than the State. The justification of the rule is that the arresting officer is paid by the City and, if there is any revenue derived from his performance of his duties, such revenue should accrue to the City. The reasonableness of such rule does not appear to have been questioned in the proceeding.

On the early morning of March 26, 1985, the plaintiff arrested Edward Lee O'Bryan for driving under the influence (DUI). Both the City and the State had corresponding provisions for DUI offenses. The plaintiff determined, in violation of the long-established rule of the City, to bypass the City judicial system and to take O'Bryan to the State magistrate for arraignment and disposition of his case. When brought before the State magistrate, O'Bryan elected to go to trial before the Magistrate without a jury, was convicted and received a sentence of 24 hours' imprisonment and a fine of $250.

When this infraction of the rule was called to his attention, the Mayor, the defendant Leslie, summoned the plaintiff to his office. When the plaintiff arrived the Mayor had with him two of the city councilmen and the chief of police. He asked the plaintiff for an explanation of the reasons for his infraction of the City rule. The plaintiff explained his action had been prompted by three reasons: these were, (1) that "there was a trial by jury problem"; (2) he had had a "previous arrest dismissed, there were two subjects, one of them was convicted and the other one was dismissed;" and, (3) there was "a problem with following the city DUI law." The first of these reasons related to the fact that the City ordinarily followed the practice if the person arrested demanded a jury trial, of dismissing the proceeding and permitting the transfer of the case to the

---

1. The decision of the district court in the case is reported in 650 F.Supp. 55 (S.D.W.Va.1986).

State magistrate. The second reason was an extension of the first. He said he had had a case where, after the case was taken to the State magistrate, the latter had dismissed the State action for "inconsistency" between the City ordinance and the State statute. Since O'Bryan was demanding a trial by jury, he feared that his case against O'Bryan would be dismissed first by the City judge and, on transfer, dismissed by the State magistrate and he wanted his arrest of O'Bryan "to stick." His final reason was that the City DUI ordinance was "null and void" for inconsistency with the corresponding State DUI statute.[2] The Mayor considered these grounds not sufficient excuse for plaintiff's violation of the rule and suspended him for one week without pay. The plaintiff appealed that suspension to the Council and then to the Hinton Civil Service Commission, which, accorded the plaintiff a full due process hearing. At the conclusion of the hearing, the suspension was upheld but the period of suspension was reduced to one day. State procedure provided for appeal from this decision. The plaintiff did not seek to appeal; he chose instead to file this suit.

At trial, a great part of the testimony related to a "custom" or "practice" followed for many years before the defendant Leslie became Mayor or Keaton Chief of Police, of using pre-signed arrest warrants when it was difficult or impossible to reach the municipal judge or Mayor for arraignment of a party who might be arrested by a member of the City police department. The defendants immediately objected, raising the relevancy of this testimony. Their counsel argued that "there's no allegation in the complaint either that the dismissal or suspension had anything to do with the practice [of using pre-signed arrest warrants]." The district court responded: "I understand that." It, however, permitted the plaintiff to proceed with extensive testimony on the practice in the Hinton Police Department of the possible use of such pre-signed arrest warrants. In fact, the bulk of the testimony offered by the plaintiff related to this practice.

There was no dispute that the Police Department in the past had had on hand pre-signed arrest warrants and the officers had in the past occasionally used such warrants to avoid going before the State magistrate when the Mayor or municipal judge was unavailable. The practice existed before the defendant Leslie became Mayor and before the defendant Keaton became Chief of Police. But, though two of his witnesses testified that the plaintiff had used, to their knowledge, pre-signed arrest warrants, the plaintiff testified categorically that he had never during his years on the force, used a pre-signed arrest warrant nor did he of his own knowledge know of

---

**2.** The City DUI ordinance stated the same elements of the DUI offense as did the State statute and provided the same penalty for violation except for the maximum period of imprisonment allowable under the two. Both provided that conviction carried a minimum imprisonment of at least one day but the city ordinance limited the allowable imprisonment to 30 days whereas the State statute permitted a sentence of imprisonment for six months. Under West Virginia law, a City DUI ordinance, which does not define the elements of the offense "in substantially similar terms" as the State DUI statute, is "null and void." Section 17C–5–11(a), West Virginia Code. The same State statute in section (b) provides that the penalty of the City ordinance should be the same as the State statute but this subsection did not provide that the ordinance should be "null and void" if it failed to be the same. This omission of the "null and void" language in subsection (b) was important. Actually, the State statute seemed to be intended to assure that in all cases, a DUI conviction, whether under the municipal ordinance or the State statute, carried some imprisonment as a minimum punishment. The City ordinance and the State statutes are identical in providing such mandatory minimum sentence. The only variation is in the maximum imprisonment allowable for violation of the statute. Whether such a minimal variation, which could not be prejudicial to a defendant charged under the City ordinance, would require an invalidation of the City ordinance could be a difficult question which is unnecessary for resolution in this case, since the decision of the district court did not turn on this point and, since this is, after all, a matter for determination by the State court. It is unlikely that any defendant will raise the question of the invalidity of the municipal ordinance since he could prefer an ordinance which does not allow as great an imprisonment for a violation as the State statute; and it is only such a party who would have standing to raise validity of the ordinance.

any officer on the police force to have used such a warrant. The important point, however, was that the plaintiff had not used such a warrant in arresting O'Bryan or in processing the case against O'Bryan. As a matter of fact, the plaintiff's own evidence established that the practice had been effectively discontinued before O'Bryan was arrested and before the plaintiff's suspension.

It was the testimony of both the defendant Leslie and Chief Keaton that in the latter part of 1984, Chief of Police Keaton was advised by the local Circuit Judge Jolliffe that pre-signed arrest warrants were illegal. This advice was passed on to Mayor Leslie and it was agreed that the practice should be discontinued. This decision seemed plainly understood in the Department. On March 13, 1985, a directive was officially posted on the Department's bulletin board stating precisely how the officers should proceed in making arrests.[3] Although the directive was in evidence, the plaintiff gave a version of it different from the written language of the directive. The plaintiff testified that this directive was posted "about three weeks" before his suspension. He identified the directive posted as the one admitted in evidence as exhibit 6, which was the directive of March 13, 1985, quoted in note 3. He then described the directive "posted signed by Mayor Leslie" as stating "that pre-signed arrest warrants/commitments had been used in the past and would be used in this administration." Counsel for the defendants, however, confronted the plaintiff with the directive and asked him to point out where that directive included a directive to use pre-signed arrest warrants. Plaintiff's counsel hastily intervened at this point to offer a stipulation that the directive had no such language as the plaintiff testified was included therein. The plaintiff was then asked by counsel for the defendants if he remembered being asked during his earlier deposition in this proceeding whether the practice of pre-signed arrest warrants had anything to do with his suspension. He responded he did not recall such question. He was then shown his deposition and he admitted he had answered such question, "No."[4] He also admitted that he had never offered failure to use a pre-signed arrest warrant as a reason why he had bypassed the municipal court and had gone to the State magistrate for the arraignment of O'Bryan. When asked whether he had violated the regulation in bypassing the municipal court in handling the O'Bryan case, he first replied, "I didn't exactly violate it, no." Again his counsel intervened by saying to counsel for the defendants: "If it will make the case easy, I will stipulate he did not follow that." The defendants' counsel was not satisfied with this statement and then read from the plaintiff's deposition in this case:

"Q. When did you first hear that your decision to take Mr. O'Bryan before the magistrate had violated any rule or procedure, if you ever did?

"A. When I took him that night, I knew I had violated the procedure.

"I did violate it, yes, sir."

The plaintiff then said that, if the order was valid, he had violated it. There is no contention that the directive was invalid.

The plaintiff called one present and one past officer on the Hinton police force to testify additionally on the use of pre-signed warrants. Only one of them said he had

---

**3.** The directive was in this language:

Concerning arrest by city police personnel for "forthwith" charges, such as DUI, please be advised that the arresting officer is to follow this procedure:

 (1) Make every possible attempt to contact the City Judge (telephone or go to residence and attempt to find);

 (2) If City Judge is not available, make every effort to contact the Mayor (telephone or go to residence and attempt to find);

 (3) If neither the City Judge nor the Mayor are available, go to the Magistrate.

In any case, be advised that for such "forthwith" charges, the arrested person is to appear before the Judge, Mayor or Magistrate, in person, and advised of his (the arrested person's rights, the amount of bail and the opportunity to pay such bail.

This directive made no provision for the use of pre-signed warrants. In fact, the mandatory language of the directive had rendered their use improper.

**4.** Appendix 228.

ever used such a warrant. The one who testified to the use said the use occurred a year or two before and was "perhaps" only once. Both of them recognized that the directive of March 13, 1985 was intended as a formal instruction to the members of the police force that they were not to use pre-signed arrest warrants if the mayor or municipal judge was not available for arraignment but were to take the person arrested in those circumstances to the State magistrate. Despite this, one of these officers (Cook) testified initially that even after the directive of March 13, 1985, he had arrested a party and was unable to locate either the Mayor or the municipal judge. Faced with that situation, he said he called the Chief for instruction and that Chief Keaton told him (Cook) "to use pre-signed warrants." Counsel for the defendants on cross-examination called the witness' attention to his testimony in his deposition given earlier on this proceeding. In his deposition testimony he had testified that the event of which he had testified occurred on March 6, 1985 (which was before the directive of March 13, 1985 and before the plaintiff's suspension by several weeks), and that the Chief's instruction was that *he was not to use pre-signed warrants.* After he had read this deposition testimony, the witness was asked

"Q. So now, when you said that it (referring to the instruction received from Chief Keaton) was after Corporal Angell's suspension you were wrong, weren't you?

"A. Yes, sir."

Thus, there was absolutely no testimony of any use by any Hinton police officer of pre-signed arrest warrant/commitments after the directive of March 13, 1985. The earlier practice of using such warrants had thus been effectively discontinued officially prior to the arrest of O'Bryan. Nor had the failure of the plaintiff to use such a warrant in making the arrest of or processing the case against O'Bryan by the plaintiff ever been understood by the plaintiff or expressed by the defendants as a reason for the plaintiff's suspension.

Despite this undisputed record, the district judge, in granting judgment in favor of the plaintiff for both compensatory and punitive damages, concluded that the plaintiff had established and the defendants had not refuted "that defendant's enforcement of the municipal policy or custom of using pre-signed warrants and jail commitments in furtherance of a facially invalid ordinance deprived Plaintiff of his First Amendment right of free expression, inasmuch as the court finds that Plaintiff's refusal to follow this patently illegal municipal policy constitutes symbolic speech." The district court added that, in suspending the plaintiff the defendants had "acted with reckless or careless disregard for the rights of the Plaintiff ..." and accordingly granted judgment for punitive damages against both the City and Leslie.

 In granting judgment as it did, the district court committed clear error of law and of fact. Punitive damages are not recoverable against a municipality under 1983. In *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 252–71, 101 S.Ct. 2478, 2752–62, 69 L.Ed.2d 616 (1981), the Supreme Court stated explicitly that punitive damages were not recoverable against a city in a 1983 action and the court in *Thomas v. City of New Orleans,* 687 F.2d 80, 84, n. 2 (5th Cir.1982), a case cited by the district court in support of its decision, recognized this prohibition against the recovery of punitive damages against a municipality in a case such as this. Further, the evidence is not only abundant but uncontradicted that, whether the action of the individual defendant Leslie was correct or not, he acted at all times under the advice of the duly selected city attorney. This contradicts entirely any basis for a recovery of punitive damages [5] against the defendant Leslie on the basis either of recklessness or carelessness. What actually the district judge bases the grant of punitive damages against the individual defend-

---

5. We do not find it necessary to rule on whether damages are recoverable under 1983 for mere carelessness, since we find no recklessness or carelessness on the part of the defendant Leslie in this case.

ant on is its decision that such defendant was reckless and careless in disregarding the plaintiff's statement of the law as opposed to that of the city attorney. The plaintiff is not a lawyer, duly licensed, but a policeman who had acquired a smattering of law while attending a seminar for police officers. The city attorney was not only a licensed lawyer but one highly respected, who was the attorney selected by the City Council to advise city officials on the law. A punitive damage award cannot stand on such a plainly faulty foundation.

But the real flaw in the district court's grant of judgment both for compensatory and punitive damages was that it rested on a finding that the defendants, by suspending the plaintiff, had violated the latter's federally protected constitutional right of free speech. The idea that the plaintiff's suspension was caused because he resorted to a violation of the City's rule on how to handle arrests when there were corresponding City and State provisions in order to publicize the City's use of illegal pre-signed arrest warrants was an idea injected into the case after the trial had been ended and the parties had made their arguments on August 18, 1986. The district court later, on September 24, 1986, issued an order in which it said that it had "fully considered the findings of facts and conclusions of law submitted by both parties" but that it was "of the opinion that supplemental briefs on the issue of the possible violation of Plaintiff's First Amendment right to free speech and other constitutional rights would be helpful to the Court in rendering its opinion." It then ordered the parties "to brief this issue," and declared that after the briefs were filed, the Court would "then render its opinion forthwith." It was on December 9, 1986 that the district court filed its opinion herein and rendered judgment in plaintiff's favor. In its decision, the district court, as we have seen, found a 1983 violation on the part of the defendants because they had suspended the plaintiff for his refusal to enforce "the municipal policy or custom of using pre-signed warrants and jail commitments in furtherance of a facially invalid ordinance" which was protected as an exercise of his (the plaintiff's) right of "symbolic speech."

The difficulty with the reasoning of the district court is that it is without any support in the record. The plaintiff did not use a pre-signed arrest warrant in making his arrest of O'Bryan nor did the matter of a pre-signed warrant figure in any way in the processing of O'Bryan's case. The plaintiff's suspension could not have been due in any way to his use or his refusal to use a pre-signed arrest warrant in processing O'Bryan's case. Actually, as we have already pointed out, the use of pre-signed warrants by the City had been recognized by the City to be illegal and the City had officially notified all police officers, including the plaintiff, not to use such warrants some time before O'Bryan's case arose. In fact, the plaintiff testified that he had never at any time while on the City police force used a pre-signed warrant and that, even before the City had officially banned the use of such warrants, the plaintiff and other officers had agreed not to use the warrants and advised the Chief of Police of their decision without any recrimination from him or any other official in City government. It is thus clear that there was absolutely no need or justification for violating other valid regulations of the Police Department in order to publicize a practice that had already been abandoned. Nor for that matter did the plaintiff, in his pleadings, in his testimony, in his interview with the Mayor before his suspension, in his hearings before the City Council or the Civil Service Commission, at his trial in the District Court state that his violation of the City regulation was for the purpose of publicizing an illegal practice of the Police Department which had been already discontinued. The plaintiff's explanation of his violation was that he feared that, if he did not take O'Bryan before the magistrate, his case might be dismissed with prejudice, and he wanted to be sure that O'Bryan's conviction "stuck." He told the Mayor that, when he had arrested O'Bryan, the latter gave him some trouble, and he wanted to be sure he was convicted. He did not deny this testimony of the Mayor. Whether this is true or not, it is clear beyond dispute

that the plaintiff was not seeking to "publicize" anything in connection with his violation of the City ordinance.

In short, the district court's conclusion of a free speech violation in this case is based entirely on manifestly false assumptions which are completely rebutted by the record herein. Without a finding of a federal constitutional or statutory violation, there was no warrant for a judgment against the defendants, whether for compensatory or punitive damages, in favor of the plaintiff.[6] It follows that the district court's grant of judgment herein against the defendants must be reversed and the cause is remanded to the district court to enter an order granting judgment in favor of the defendants.

REVERSED AND REMANDED.

---

**6.** The district court's determination was not to tack her decision in favor of the plaintiff on fifth amendment due process grounds (which was the ground asserted by the plaintiff in his complaint). It is doubtful that a one-day suspension may be regarded as a deprivation of any property interest. In *Carter v. Western Reserve Psychiatric Habilitation,* 767 F.2d 270, 272, n. 1 (6th Cir.1985), the court said that a two-day suspension of an employee without pay might theoretically constitute a property deprivation but it regarded such deprivation "as *de minimis* and not deserving of due process considera-

tion." Even if it were deserving such consideration, the plaintiff received all the due process rights he could legitimately demand. *See Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); Note, *Procedural Due Process Protection for Public Employees,* 47 Ohio St.L.Journal, 1115 (1986). It was obvious that these considerations prompted the district court to stretch out to seek to find a free speech basis for sustaining the plaintiff's action. As we have pointed out, this stretching out founders on the absence of any factual basis for such a claim.